**No. 26-60119**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

CHARLES SLAUGHTER,

Plaintiff-Appellant

v.

DOCTOR DANIEL P. EDNEY, in his official capacity as the Mississippi State Health Officer,

Defendant-Appellee

MISSISSIPPI ASSOCIATION FOR HOME CARE,

Intervenor Defendant-Appellee.

---

On Appeal from the United States District Court for the Southern District of Mississippi
3:20-CV-789

---

**BRIEF OF APPELLANT CHARLES SLAUGHTER**

---

AARON R. RICE
American Dream Legal
1888 Main Street, Suite C, 164
Madison, Mississippi 39110

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Defendant-Appellee:

Dr. Daniel P. Edney, in his official capacity as Mississippi State Health Officer

Intervenor Defendant-Appellee:

Mississippi Association for Home Care

Plaintiff-Appellant:

Charles Slaughter

Counsel for Defendant-Appellee:

Stephen F. Schelver
Office of the Attorney General
Jackson, Mississippi

Gerald Lee Kucia
Mississippi Department of Human Services
Jackson, Mississippi

Counsel for Intervenor Defendant-Appellee:

Paul N. Davis
Caroline Baker Smith
Butler Snow, L.L.P.
Ridgeland, Mississippi

<u>Counsel for Plaintiff-Appellant:</u>

Aaron R. Rice
American Dream Legal
Madison, Mississippi

A. Seth Robbins
Lakeland Law Group, PLLC
Flowood, Mississippi

*/s/ Aaron R. Rice*
AARON R. RICE
Attorney of record for Plaintiff-Appellant Charles Slaughter

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This case raises significant questions regarding the scope of the due process clause of the United States and Mississippi Constitutions and the appropriate application of rational basis scrutiny affecting myriad unenumerated constitutional rights. Appellant believes oral argument is necessary for full consideration of these issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................... ii

STATEMENT REGARDING ORAL ARGUMENT .........................................iv

TABLE OF CONTENTS .......................................................................................v

TABLE OF AUTHORITIES ................................................................................vii

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION .................................................................. 2

STATEMENT OF THE ISSUES ......................................................................... 2

STATEMENT OF THE CASE ............................................................................3

A. Slaughter saw growing need in home health and wanted to meet it. ....5

B. A six-month Moratorium became a 45-year ban. ............................... 6

C. The CON Law makes startups prove need incumbents can absorb. ....7

D. The CON Law makes Slaughter's path nearly insurmountable. ......... 9

E. Powerful incumbents protect the CON Law. ...................................10

F. The district court struck the Moratorium but not the CON Law. ..... 11

SUMMARY OF THE ARGUMENT ..................................................................12

STANDARD OF REVIEW ................................................................................. 13

ARGUMENT.............................................................................................................14

I. The district court inconsistently applied the rational-basis test. .................14

A. The district court properly required the Moratorium to have a real link to a public benefit but assumed that link for the CON Law. ............. 14

B. The district court properly relied on evidence refuting the Moratorium's rationales but ignored evidence on the CON Law's. .. 16

II. Applied consistently, the CON Law fails rational basis review. ................. 20

A. CON laws make no sense in home health. ....................................... 21

B. The CON Law is not rationally related to public health and safety... 22

C. The CON Law is not rationally related to containing costs. ............ 22

D. The CON Law is not rationally related to increasing access. ........... 24

E. The CON Law is not rationally related to improving quality. ........... 27

III. The Constitution protects a fundamental right to earn a living................... 31

IV. The district court erred in denying Plaintiff's attorney fees. ...................... 34

CONCLUSION ....................................................................................... 37

CERTIFICATE OF SERVICE ............................................................... 38

CERTIFICATE OF COMPLIANCE ....................................................... 39

ADDENDUM ........................................................................................ 40

15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 1.1 ......................................... 40

# TABLE OF AUTHORITIES

**Cases:** **Pages(s)**

*Barsky v. Bd. of Regents of Univ. of N.Y.*,
347 U.S. 442 (1954) ........ 32

*Borden's Farm Prods. v. Baldwin*,
293 U.S. 194 (1934) ........ 14, 17

*Bruner v. Zawacki*,
997 F. Supp. 2d 691 (E.D. Ky. 2014) ........ 20

*Caracci v. Comm'r*,
118 T.C. 379 (2002), *rev'd on other grounds*,
456 F.3d 444 (5th Cir. 2006) ........ 7, 11

*Cornwell* v. *Hamilton*,
80 F. Supp. 2d 1101 (S.D. Cal. 1999) ........ 19

*Dent v. West Virginia*,
129 U.S. 114 (1889) ........ 33, 34

*Dias v. City and Cnty. of Denver*,
No. 07-cv-00722-WDM-MJW,
2010 WL 3873004 (D. Colo. Sept. 29, 2010) ........ 19

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ........ 31

*Doe v. Silsbee Indep. Sch. Dist.*,
440 F. App'x 421 (5th Cir. 2011) ........ 35, 36

*Farrar v. Hobby*,
506 U.S. 103 (1992) ........ 35

*Golden Glow Tanning Salon, Inc. v. City of Columbus*,
52 F.4th 974 (5th Cir. 2022) ........ 32, 33, 34

*Harris County v. CarMaxAuto Superstores Inc.*,
177 F.3d 306 (5th Cir. 1999) ........ 14

*In re Certificate of Need for Aston Park Hosp., Inc.*,
193 S.E.2d 729 (N.C. 1973) ........................................................................ 20

*Jackson Mun. Airport Auth. v. Bryant*,
No. 3:16-CV-246-CWR-FKB,
2017 WL 3175915 (S.D. Miss. July 25, 2017) ..................................................... 11

*Lucid Grp. USA, Inc. v. Johnston*,
No. 1:22-CV-1116-RP,
2023 WL 5688153 (W.D. Tex. June 21, 2023).................................................29

*McCorkle v. Metropolitan Life Ins. Co.*,
757 F.3d 452 (5th Cir. 2014) ........................................................................ 13

*Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va.*,
985 F.2d 164 (4th Cir. 1993) ................................................................. 21, 25

*New State Ice Co. v. Liebmann*,
285 U.S. 262 (1932)........................................................................................34

*Newell-Davis v. Phillips*,
No. 22-30166,
2023 WL 1880000 (5th Cir. Feb. 10, 2023) .............................................14, 22

*O'Gorman & Young, Inc. v. Hartford Fire Ins. Co.*,
282 U.S. 251 (1931)........................................................................................34

*Payne v. Univ. of S. Miss.*,
681 F. App'x 384 (5th Cir. 2017) ................................................................... 13

*Slaughter-House Cases*,
83 U.S. (16 Wall.) 36 (1872)...........................................................................34

*Smith v. Texas*,
233 U.S. 630 (1914)......................................................................................... 33

*St. Joseph Abbey v. Castille*,
835 F. Supp. 2d 149 (E.D. La. 2011)................................................................ 17

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013)...........................................................14, 17, 19, 29

*Stallworth v. Bryant*,
936 F.3d 224 (5th Cir. 2019) .......... 11

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .......... 33

*Sup. Ct. of N.H. v. Piper*,
470 U.S. 274 (1985) .......... 33

*Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*,
489 U.S. 782 (1989) .......... 36

*Truax v. Raich*,
239 U.S. 33 (1915) .......... 32

*Truesdell v. Friedlander*,
80 F.4th 762 (6th Cir. 2023) .......... 21

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) .......... 29

*United States v. Carolene Prods. Co.*,
304 U.S. 144 (1938) .......... 12, 17

*Walgreen Co. v. Rullan*,
405 F.3d 50 (1st Cir. 2005) .......... 20, 25

*Walker v. City of Mesquite*,
313 F.3d 246 (5th Cir. 2002) .......... 35

**Constitutional Provisions:**

MISS. CONST. ART. III, § 14 .......... 11

U.S. CONST. AMEND XIV .......... passim

**Statutes:**

28 U.S.C. § 1291 .......... 2

28 U.S.C. § 1331 .......... 2

28 U.S.C. § 1343 .......... 2

42 U.S.C. § 1983 .......... 2

42 U.S.C. § 1988 .......... 3, 13, 35, 36

MISS. CODE ANN. § 41-71-13 .......... 5

MISS. CODE ANN. §§ 41-7-171 *et seq.* .......... 3

**Regulations:**

15 MISS. ADMIN. CODE PT. 9, SUBPT. 91 .......... passim

**Rules:**

FED. R. APP. P. 4(A)(1)(A) .......... 2

**Other Authorities:**

Timothy Sandefur, *The Right to Earn a Living*, 6 Chap. L. Rev. 207 (2003) .......... 32

# INTRODUCTION

Mississippi's Certificate-of-Need Law ("CON Law") tells Appellant Charles Slaughter that he cannot open a home health agency unless he proves a "need" for he services—a "need" his future competitors are entitled to absorb before he can even apply. This law is undoubtedly effective at protecting existing agencies from competition. The record below shows that the one-sided "need" requirement, combined with the ability of future competitors to intervene in the decision-making process and the State's persistent failure to monitor home health usage, virtually ensures aspiring agencies remain fenced out. ROA.2078-79, 3862-63. But that same record also demonstrates that the CON Law is not rationally related to any *legitimate* state interest. All such rationales are plainly refuted either by the State's own records and testimony, or by overwhelming empirical evidence, or both.

The district court relied on this evidence to invalidate a moratorium on the issuance of new home health CONs (the "Moratorium"). But the court declined to evaluate Slaughter's evidence on the CON Law itself, deeming the existence of unrefuted record evidence "immaterial."

That was error. As the district court's own analysis of the Moratorium demonstrates, a rational relationship must be based on specific facts, not simply assumed. This Court should reverse the decision to uphold the CON Law and the denial of attorney's fees for Slaughter's successful challenge to the Moratorium.

## STATEMENT OF JURISDICTION

Plaintiff-Appellant filed this lawsuit in the United States District Court for the Southern District of Mississippi under 42 U.S.C. § 1983. ROA.23. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. ROA.24.

The district court entered final judgment on January 28, 2026, disposing of all claims as to all parties. ROA.3883. This Court has jurisdiction under 28 U.S.C. § 1291. The appeal is timely: Appellant filed his Notice of Appeal on February 27, 2026, within 30 days as required by FED. R. APP. P. 4(A)(1)(A). ROA.3899.

## STATEMENT OF THE ISSUES

The district court invalidated Mississippi's 45-year Moratorium on new home health agencies as violating the Due Process Clause of the Fourteenth Amendment, applying the rational-basis standard to a developed evidentiary record. But on the same record, the court upheld Mississippi's Certificate-of-Need (CON) Law, which conditions entry into the home-health market on proving a "need" that existing providers are entitled to absorb. The issues on appeal are:

1) Whether the district court applied rational-basis review inconsistently by engaging record evidence to invalidate the Moratorium but treating similar evidence as "immaterial" when upholding the CON Law.

2) Whether the CON Law survives judicial review on the full record, which shows the law is not rationally related to its asserted purposes.

3) Whether the right to earn a living is a fundamental right under the Due Process Clause of the Fourteenth Amendment.

4) Whether the district court erred in denying Slaughter's attorney fees under 42 U.S.C. § 1988 after he prevailed on his Moratorium claim.

## STATEMENT OF THE CASE

Appellant Charles Slaughter is a physical therapist who runs a clinic in Jackson, Mississippi specializing in care for elderly patients. ROA.26, 2123. That experience convinced him that homebound patients in his community were not receiving enough time-intensive, quality care. ROA.2109-2110, 2111. When the pandemic deepened this problem, Slaughter resolved to open his own home health agency to solve it. ROA.2127. But two overlapping state laws stood in his way.

The first statute, Mississippi's Certificate-of-Need law, would allow Slaughter to open an agency only if his community met the State's crude estimates of sufficient "need" for his services. MISS. CODE ANN. §§ 41-7-171 *et seq.* Existing agencies, meanwhile, would be free to absorb that "need" before it reached the threshold for approval of Slaughter's CON. 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 8.1. And if it did reach the threshold, the incumbents could challenge Slaughter's CON application and haul him into court. *Id.* at 3.7, 3.12.

At the time, however, none of that mattered. Only two years after the CON Law was introduced, it was rendered superfluous by the adoption of a moratorium on CONs that prohibited new agencies altogether. MISS. CODE ANN. § 41-7-191(9); 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 2.2. Notwithstanding its official description as a temporary "moratorium," the ban stood for a total of 45 years, a national record which remains unbroken today. ROA.3865, 2593.

Faced with this barrier, Slaughter sued. On motions for summary judgment, the district court invalidated the Moratorium but upheld the CON Law. ROA.3882. The court also denied Slaughter's request for attorney's fees, reasoning that each party's motion was partially granted. ROA.3882. Slaughter timely appealed from the court's holdings on the CON Law and fee award.

Both of those holdings were error. The district court applied rational-basis review to the CON Law without engaging the record Plaintiff had developed showing the law has no real link to its stated purposes. And the court's denial of attorney's fees is unsupported by law: no authority premises prevailing-party status on the success of every claim. This Court should reverse both rulings, grant summary judgment to Appellant, and remand for determination of a fee award.

## BACKGROUND

### A. Slaughter saw growing need in home health and wanted to meet it.

Home health agencies provide health services prescribed by a physician and delivered in the patient's home. MISS. CODE ANN. § 41-71-13. In Mississippi, they provide skilled nursing services and at least some subset of physical, occupational, or speech therapy; medical social services; home-health aide services; medical supplies and appliances; certain drugs and biologics; or medical care from a hospital resident in training. *Id.* The patients they serve are primarily those with chronic conditions, typically elderly Mississippians. ROA.2035.

Mississippi's population is aging rapidly, and demand for home-health services has steadily grown. ROA.2035. The COVID-19 pandemic further accelerated that demand, as Mississippi physicians "utilized home health more frequently" during the pandemic. ROA.2081. Home-health services can also reduce the need to place elderly patients in nursing homes, which were prone to viral outbreaks. ROA.2081.

Slaughter saw this need up close. Early in his career, he did consulting work for home health agencies in Mississippi, and he came to believe the agencies serving the State were overbooked and not providing time-intensive, quality care to their patients. ROA.2109-10. After he opened his own clinic, he saw the same gap from a different angle: his clinic patients were routinely discharged from home

health without receiving the specific therapies they needed, which would have helped them tremendously. ROA.2110, 2114. So he dreamed of expanding his clinic by opening a home health agency to provide better care to homebound patients. ROA.2111. When the pandemic deepened this need, he decided to pursue that dream. ROA.2127.

### B. A six-month Moratorium became a 45-year ban.

The Moratorium emerged in the early 1980s alongside Mississippi's broader CON regime. The Mississippi Health Care Commission, the predecessor agency of the Mississippi State Department of Health (the "State" or "MSDH"), imposed a short-term administrative Moratorium in 1981 to give itself time to develop CON criteria for home health agencies. ROA.2729. Before that administrative Moratorium expired in 1983, the Mississippi Legislature replaced it with a statutory version. ROA.2841. The Commission "did not ask for" the statutory Moratorium and "took no stand on" it. ROA.2841. Incumbents did. The Mississippi Association for Home Care (MAHC), Intervenor Defendant-Appellee here, had been advocating to continue the Moratorium since 1981, and MAHC's then-president was "actively involved in [its] initiation." ROA.2813, 2787.

Incumbents had every reason to want the Moratorium. At the time, Medicare reimbursed home health agencies on a cost basis, which permitted

operators to generate "executive-level salaries and benefits" and "accumulate substantial assets" in their businesses. *Caracci v. Comm'r*, 118 T.C. 379, 404 (2002), *rev'd on other grounds*, 456 F.3d 444 (5th Cir. 2006). Agencies quickly became "cash cows." ROA.2065. But that economic foundation collapsed in 1999, when Medicare moved home health agencies to a flat fee payment system. *Caracci*, 118 T.C. at 390; ROA.2065; *see also* ROA.3872. Yet the Moratorium persisted.

Between 1981 and 2020, the number of home-health patients in Mississippi quadrupled, from 23,462 to 94,280. ROA.2449, 2464. Over the same period, the number of agencies fell from 135 to 46. ROA.2450, 2464; *see also* ROA.3847-48. After accounting for common ownership, only 27 distinct providers remained. ROA.2578-80. As a result, Mississippi was left with fewer home health agencies per capita than 39 other states. ROA.2601-2602.

### C. The CON Law makes startups prove need incumbents can absorb.

These problems will persist to some degree even after the Moratorium's invalidation. The CON Law conditions entry to the home-health market on satisfaction of sixteen criteria, the most important being meeting the State Health Plan's "need" methodology. 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 8.1.

The State Health Plan defines "need" in terms of regional usage rates. For each county, the State Health Plan calculates the rate at which elderly people in

Mississippi and nine surrounding states use home-health services. ROA.2141. That regional rate is treated as the correct level of home-health utilization. ROA.2141. The applicant must then calculate the rate at which elderly people in the proposed service county currently use home-health services, and compare it to the regional rate. ROA.2141. Only if the proposed county's rate is lower than the regional rate is there any "need." ROA.2141. And only if another crude formula estimates that gap to be the equivalent to at least 50 patients may a new agency open. ROA.2141.

This methodology gives incumbents a decisive advantage. While startups cannot open unless "need" rises to the 50-patient threshold, existing agencies face no such requirement. ROA.2901. Incumbents are free to expand their services to absorb new "need" before it reaches the threshold. ROA.2901. That imbalance hands incumbents the power to keep competitors fenced out. ROA.2036.

Beyond the "need" methodology, the CON application process itself is structured around incumbent opposition. Mississippi's CON applicants typically need to retain attorneys and consultants just to navigate the complicated process. ROA.2891. Once an application is deemed complete, MSDH notifies any "affected persons." 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, RS. 3.7, 3.12. In practice, the "affected persons" who oppose applications are existing providers, the applicant's future competitors. ROA.2894; *see also* ROA.3868. Any "affected person" may

request a public hearing on the application. 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 3.12. That functions as a full-blown trial, featuring counsel; expert witnesses; exhibits; live testimony; written motions; and a judicial appeal. ROA.2893-2896.

**D. The CON Law makes Slaughter's path nearly insurmountable.**

With the Moratorium invalidated, Slaughter can now apply for a CON. But the CON Law would still confront him with massive hurdles. He would have to prove that elderly home-health usage in his proposed county meets the State Health Plan's estimation of 50 patients below the regional rate. ROA.2141. Of course, existing providers could absorb that "need" before he was approved. ROA.2901. And the process would be expensive, given the need for counsel and consultants. ROA.2891. If he weathered those challenges, any incumbent could still oppose his application, forcing an expensive and time-consuming hearing and appeal. 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 3.12; ROA.2893-2896.

The State has compounded these hurdles by stopping the work its own "need" formula requires. As the district court itself acknowledged, MSDH has not assessed "need" statewide under its own formula since at least 2018. ROA.3862. The State's primary witness, Dr. Lampton, who chairs the Mississippi State Board of Health, explained why: MSDH stopped maintaining the regional data its formula requires. ROA.2078-79. Worse still, MSDH has not published a county-level

"need" assessment since 1992. ROA.3862 (citing ROA.2083-85); *see also* ROA.2137-2458 *passim*.[1] Without that data, it is currently impossible for any applicant to prove "need" under the State's methodology. ROA.2079. Together, these barriers make Slaughter's path nearly insurmountable.

**E. Powerful incumbents protect the CON Law.**

Mississippi's CON regime has long been protected by powerful incumbents. The district court itself recognized as much from the outset, observing at the pleading stage that "it is no secret that significant financial interests are at stake when it comes to CON laws." ROA.616. The State's own primary witness was more direct: "very powerful" interest groups, he testified, use "politics" to prevent the repeal of the CON Law. ROA.2068.

At the center of those efforts is MAHC. Its incumbent members understand the stakes: "It's the same pie," as one industry witness put it, "and slicing more pieces" would shrink their share. ROA.2681.[2] So MAHC lobbies to preserve the CON Law "every year." ROA.2626. Indeed, MAHC describes the "continued protection of the Certificate of Need through state legislative efforts and strong

[1] No witness even knew when MSDH last calculated the "need" for individual counties. *See* ROA. 2063, 2631, 2882, 3034.

[2] *See also* ROA.2681. ("Q. And that's why you believe that a certificate of need is needed to have enough census for these home health agencies is to ensure their profitability? [] A. Yes. Q. To ensure that they don't lose business to new competitors? [] Yes.").

legislative lobby presence" as its primary "advocacy accomplishment." ROA.2951. It even maintains a separate political action committee for that very purpose. ROA.2626. The district court acknowledged this dynamic, observing that CON-holding agencies "lobby the Mississippi legislature in the interests of keeping the Moratorium in place, thus preserving the monopoly of others who received Certificates before the Moratorium." ROA.3876 (quoting *Caracci*, 118 T.C. at 410). And when Slaughter brought this lawsuit, MAHC intervened, in part because "if Plaintiff prevailed, it would result in increased competition to MAHC's members." ROA.2629. In the first year of this litigation alone, MAHC spent more than its entire annual revenue defending the CON Law and Moratorium. ROA.2623.

### F. The district court struck the Moratorium but not the CON Law.

Slaughter challenged the Moratorium and CON Law under the due process and equal protection guarantees of the United States and Mississippi Constitutions. ROA.23.[3] The State filed a motion for judgment on the pleadings and MAHC filed a motion to dismiss, arguing that Slaughter's claims could not overcome the rational-basis standard. ROA.608. The district court denied both, recognizing that

[3] The Mississippi Constitution affords the same due process and equal protection guarantees as the Fourteenth Amendment. *See Jackson Mun. Airport Auth. v. Bryant*, No. 3:16-CV-246-CWR-FKB, 2017 WL 3175915, at *5 (S.D. Miss. July 25, 2017) (unpublished); *Stallworth v. Bryant*, 936 F.3d 224, 227 n.5 (5th Cir. 2019) (quotation omitted). The district court analyzed both Slaughter's sand federal due process claims under rational-basis review. ROA.3850-51.

courts “may delve into evidence of irrationality” in rational-basis cases. ROA.614 (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938)).

On January 28, 2026, the district court granted partial summary judgment to Slaughter, holding that the Moratorium violates the Due Process Clause. ROA.3882. The court relied on evidence adduced by Slaughter to prove the Moratorium irrational, but nonetheless found it “immaterial” that other rationales asserted for the CON law were contradicted by unrefuted evidence. ROA.3856. Consequently, the court partially granted the State and MAHC’s summary judgment motions and upheld the CON Law. ROA.3882. The court also denied Slaughter’s request for attorney’s fees. ROA.3882.

Slaughter timely appealed the upholding the CON Law and denial of his attorney’s fees. ROA.3899. Neither the State nor MAHC cross-appealed.

## SUMMARY OF THE ARGUMENT

This appeal is about whether rational-basis review allows courts to rely on record evidence to invalidate one law and deem similar evidence “immaterial” to uphold another. The district court did just that. It invalidated Mississippi’s 45-year Moratorium based on the evidence Slaughter developed below. And on the same record, it upheld Mississippi’s CON Law without evaluating the evidence that showed none of the law’s asserted rationales survive scrutiny.

Slaughter proceeds in four parts. Part I shows that the district court applied rational-basis review inconsistently and that the inconsistency is reversible error. Part II shows that, applied consistently, the CON Law fails rational-basis review on the full record: CON theory makes no sense for home health; the law is not rationally related to public health and safety; to containing costs; to increasing access; or to improving quality. Part III preserves, for *en banc* and Supreme Court review, the argument that the right to earn a living is a fundamental right. Part IV shows the district court erred in denying Slaughter's attorney fees under § 1988.

## STANDARD OF REVIEW

This Court reviews rulings on cross-motions for summary judgment *de novo*, viewing the facts in the light most favorable to the non-moving party. The Court must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *McCorkle v. Metropolitan Life Ins. Co.*, 757 F.3d 452, 456 (5th Cir. 2014).

This Court reviews a district court's decision on whether to award attorney's fees for abuse of discretion. *Payne v. Univ. of S. Miss.*, 681 F. App'x 384, 387 (5th Cir. 2017) (citations omitted). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (citations omitted).

# ARGUMENT

## I. The district court inconsistently applied the rational-basis test.

Under the Due Process Clause of the Fourteenth Amendment, any restriction on the right to earn a living must be rationally related to a legitimate state interest. *See, e.g.*, *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013). Though deferential, the rational basis test "is not a toothless one." *Harris County v. CarMaxAuto Superstores Inc.*, 177 F.3d 306, 323 (5th Cir. 1999) (quotation omitted). It establishes "a *rebuttable* presumption" that the challenged law is constitutional. *Borden's Farm Prods. v. Baldwin*, 293 U.S. 194, 209 (1934) (emphasis supplied). Consequently, plaintiffs may "negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey*, 712 F.3d at 223.

### A. The district court properly required the Moratorium to have a real link to a public benefit but assumed that link for the CON Law.

In *Newell-Davis v. Phillips*, the Fifth Circuit considered a challenge to Louisiana's Facility Need Review program, the Louisiana analog of a CON law, that required prospective respite-care providers to demonstrate need before the Louisiana Department of Health would consider their license application. No. 22-30166, 2023 WL 1880000, at *1 (5th Cir. Feb. 10, 2023) (unpublished). The Court upheld the program, but only because Louisiana had shown a real link between the law and its claimed consumer-welfare benefit. *Id.* at *4. The Court held that a state

may "limit" entry into a regulated healthcare market "so long as there is a 'real' link between the tool and the benefits." *Id.* And the "rational relationship must be real"—"based on specific facts," not "simply assumed." *Id.*

The district court applied that standard correctly to the Moratorium. It relied on State testimony that, even without the ban, consumers would remain effectively protected. Mr. Wood, the MSDH official responsible for the State's regulatory oversight of home health agencies, confirmed in deposition that MSDH "would still be able to provide effective oversight" without the Moratorium. ROA.2717. The court treated that admission as decisive: "in deposition, the MSDH's designees confirmed that, while removing the Moratorium would increase workload, the MSDH would still be able to provide effective oversight without it." ROA.3871 (citing ROA.2717). With the State's purported link between the law and consumer welfare refuted by the State's own witness, the Moratorium failed. ROA.3869.

Mr. Wood's testimony was equally clear about the CON Law. Asked whether MSDH could continue effective oversight if both the Moratorium *and* the CON Law were removed, he confirmed that conducting surveys would "not be impossible[,]" ROA.2712, 2715, 2717; that MSDH would still be able to provide "effective oversight[,]" ROA.2717; and that the absence of these restrictions

would not "affect patients in Mississippi *at all*[,]" ROA.2712 (emphasis supplied). Likewise, Dr. Lampton explained that the economics of the industry would prevent a "proliferation" of new agencies if both restrictions were lifted. ROA.2065.

Despite that record, the court did not require the State to show a real link between the CON Law and any consumer benefit. The court instead accepted the State's *post-hoc* hypothesis that, absent the CON Law, an "influx of new providers" could "swamp MSDH's resources." ROA.3855 (citing ROA.1451). Whether such an influx would actually occur was, the court held, "immaterial so long as the government has demonstrated that it is 'arguable' that such an influx would burden their administrative resources." ROA.3856. That is not the real link *Newell-Davis* requires. It is the "simply assumed" link *Newell-Davis* forbids. 2023 WL 1880000, at *4. And here, the link was worse than assumed: it was contradicted by the very witnesses the court credited to invalidate the Moratorium.

### B. The district court properly relied on evidence refuting the Moratorium's rationales but ignored evidence on the CON Law's.

Since the inception of the modern rational-basis test, plaintiffs have been allowed to disprove the State's asserted rationales with evidence. While the plaintiff "must carry the burden" of demonstrating that a challenged law is unconstitutional, the plaintiff may do so "by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the

action is arbitrary." *Borden's Farm Prods.*, 293 U.S. at 209. And while the State enjoys a presumption that supporting facts exist, it does so only "unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938).

This remains true today. *St. Joseph Abbey*, this Court's leading decision on illegitimate protectionism, invalidated a Louisiana law that made funeral homes the exclusive sellers of caskets. 712 F.3d at 217. Louisiana had argued that banning unregulated sales could, in theory, prevent deceptive sales tactics. This Court rejected that theory because FTC findings showed the hypothesized deception was not happening in the real world. *Id.* at 226. Those findings "shed[] much light on the disconnect between the post hoc hypothesis" and the law's actual, protectionist effects. *Id.*; *see also St. Joseph Abbey v. Castille*, 835 F. Supp. 2d 149, 154–55 (E.D. La. 2011) (district court explaining that the FTC's "findings and actions . . . provide salient evidence" and relying on testimony from an "expert on the economics" of the regulated industry).

Here, the district court applied this longstanding approach to the Moratorium, directly relying on evidence adduced by Slaughter. The State's own 2020 report showed that thousands of Mississippians were denied home-health

referrals each year because services were unavailable or they fell outside licensed service areas. ROA.3864 (citing ROA.2469). Government records also showed that home-health access was obstructed even during the pandemic, despite there being a declared public health emergency. ROA.3874-75 (citing ROA.3058-64). MSDH had not assessed statewide "need" since 2018, ROA.3862; *see also* ROA.2078-79, and had not assessed county-level "need" since 1992, even though the Moratorium's central premise was a supposed lack of need. ROA.3862-63 (citing ROA.2083-85); *see also* ROA.2137-2458 *passim*. The number of home health agencies had declined since the moratorium's enactment, ROA.3847-48, and those that remained had become "conglomerate enterprises." ROA.3876 (citing ROA.2066). On that record, the court invalidated the Moratorium. ROA.3877.

The district court took the opposite approach to the CON Law. Some of the same evidence the court credited to invalidate the Moratorium bears equally on the CON Law: the State's 2020 data on denied home-health referrals indicts the regulatory regime as a whole, not just the Moratorium. ROA.2469. And the government records likewise show limited access to care during the pandemic which the CON Law itself produced. ROA.3058-64. Plaintiff also submitted substantial CON-specific evidence: expert testimony from Dr. Stratmann, a leading CON-laws researcher; peer-reviewed studies specific to home-health CON laws;

consistent federal-agency findings from the FTC, DOJ, and HHS; additional data from the State; and the admissions of the State's own witnesses. ROA.3085-96. That record, evaluated on its merits, refutes every consumer-welfare rationale the State asserts for the CON Law. *See* Part II. The court did not evaluate it.

The court justified its approach with a categorical rule of its own design: "To the extent experts disagree, rational basis review does not grant the Court authority to determine the validity of research." ROA.3853-54. The court cited no authority for that proposition. And other courts have repeatedly weighed competing expert testimony under rational-basis review. *See, e.g., Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1109 n.23, 1112 (S.D. Cal. 1999) (holding law irrational and noting defendants' experts' contentions were "refuted" by other evidence or were "unsubstantiated views" appearing "grounded more on ideology than facts."); *Dias v. City and Cnty. of Denver*, No. 07-cv-00722-WDM-MJW, 2010 WL 3873004, at *7 (D. Colo. Sept. 29, 2010) (unpublished) ("With this record, a reasonable trier of fact may find that Plaintiffs' experts are correct and" that "given the current state of the science [the challenged law] is not rationally based to serve the legitimate government purpose.").

The court's selective consideration of evidence cannot stand. Rational-basis review demands a single evidentiary standard, *see St. Joseph Abbey*, 712 F.3d at 226,

and the same standard that defeated the Moratorium defeats the CON Law. As Part II demonstrates, the full record, examined on the merits, requires invalidation.

## II. Applied consistently, the CON Law fails rational basis review.

On the full record, Mississippi's CON Law is not rationally related to any legitimate state interest as applied to home health. Courts have invalidated CON laws before. The North Carolina Supreme Court struck down a hospital CON law as unconstitutional. *In re Certificate of Need for Aston Park Hosp., Inc.*, 193 S.E.2d 729, 736 (N.C. 1973) ("The Constitution of this State does not . . . permit the Legislature to grant to the Medical Care Commission authority to exclude Aston Park from this field of service in order to protect existing hospitals from competition otherwise legitimate."). A federal district court reached the same conclusion about Kentucky's CON law for moving companies. *Bruner v. Zawacki*, 997 F. Supp. 2d 691, 700 (E.D. Ky. 2014) ("To the extent that the protest and hearing procedure prevents excess entry into the moving business, it does so solely by protecting existing moving companies—regardless of their quality of service—against potential competition."). And the Sixth, First, and Fourth Circuits have invalidated CON laws under the Dormant Commerce Clause's *Pike* balancing test. *Truesdell v. Friedlander*, 80 F.4th 762 (6th Cir. 2023); *Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005); *Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va.*, 985

F.2d 164 (4th Cir. 1993). Mississippi's home health CON Law should likewise be invalidated since it is not rationally related to public health and safety, containing costs, expanding access, or improving quality.

### A. CON laws make no sense in home health.

CON laws were designed for a problem home health does not pose. They were created to centralize "large capital investment[s]" in healthcare services with "enormous fixed costs": hospitals, MRI machines, PET scanners, and the like. ROA.2024-25. The theory was that providers reimbursed on a cost basis would overinvest in expensive equipment and recoup it through higher service rates. ROA.2013, 2023. Home health is nothing like that. It requires little startup capital, and its costs are overwhelmingly labor, not infrastructure. ROA.2025. Even the State's expert, Mr. Daniel Sullivan, acknowledged that the initial investment for a home health agency is small. ROA.3001. He countered that "ongoing expenses" can grow with agency size, ROA.3001, but those expenses too are predominantly labor, which scales up and down with patient demand. ROA.2025.

The overinvestment problem CON laws were designed to address has never existed in home health. CON regulation of home health is a solution to a problem that does not exist.

### B. The CON Law is not rationally related to public health and safety.

The State's primary defense of the CON Law rests on public health and safety: without the law, the State warns, an influx of new providers might "swamp MSDH's resources" and degrade the State's ability to oversee home health agencies. ROA.1451. As Part I.A explains, that defense fails. Mr. Wood confirmed that effective oversight will continue without the CON Law. ROA.2717. And the State's star witness explained that the State's hypothesized influx is precluded by the unavoidable economics of the industry. ROA.2065.

The State's link between the CON Law and public health is not the real link *Newell-Davis* requires—it is the "simply assumed" link that *Newell-Davis* forbids, all while being contradicted by the State's own witnesses. 2023 WL 1880000, at *4.

### C. The CON Law is not rationally related to containing costs.

The record refutes the State's cost-containment rationale. A 2016 meta-analysis of twenty peer-reviewed studies found that "[t]he overwhelming weight of evidence suggests that CON laws are associated with both higher per unit costs and higher total expenditures." ROA.2015-16. The research specific to home health is more one-sided still. The published studies conclude that CON regulation "appears to be associated with higher costs," ROA.2029, that "[p]ermitting free entry by home health agencies . . . most likely would lower [costs]," ROA.2030, and that "[r]emoving entry regulations for home health would have negligible

system wide effects on health care costs." ROA.2031. After reviewing every study of home-health CON laws, Dr. Stratmann concluded that "the literature specific to home health shows that CONs at best fail to improve the system, and more likely make healthcare worse." ROA.2038. The FTC, DOJ, and HHS have reached the same conclusion. ROA.2014-15. Even the State's own expert agrees that the published research says CONs do not reduce costs. ROA.2902.

Defendants have nonetheless suggested that, even if the CON Law does not lower costs directly, limiting competition might allow the shielded providers to achieve economies of scale. ROA.3693, 2919. But that theory has been tested directly. Studying firm-level data on home health agencies, researchers found "no evidence that CON regulation contributes to efficiency in the realization of scale economies." ROA.2029.

Defendants also argued that a 2016 peer-reviewed study shows CONs lower home-health costs. ROA.1103. But the study does not support that conclusion. It found that home-health spending grew slower in states with home health CONs — but nursing-home spending grew faster in those same states, as patients were simply diverted from one to the other. ROA.1811. In fact, the study's own authors concluded that the "persistence of CON laws may *increase* future aggregate

spending," because nursing homes are more expensive than home health. ROA.1814 (emphasis supplied).

The State has tried to escape this record by claiming that the results of academic studies are "mixed." ROA.1453. They are not. When pressed for the studies on its side of the supposed mix, the State produced three citations: a consultant report commissioned by incumbent CON-holders that does not even discuss home health; a study on hospitals (not home health) that concluded CONs led to increased efficiency (not lower costs); and a paper that is not about CONs at all. ROA.3040-41. Whatever "debatable" means under rational-basis review, it cannot mean that three off-topic citations, one of them paid for by incumbent CON-holders, outweigh four decades of independent research and the unanimous conclusion of the FTC, DOJ, and HHS. On the full record, it is overwhelmingly clear that the CON Law has no rational relationship to cost containment.

### D. The CON Law is not rationally related to increasing access.

CONs restrict access to home health care by definition. The Mississippi CON Law expressly prevents "duplication of health resources" that the regulations deem "unnecessary." 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 1.1 (text in Addendum). That means less access. As the Fourth Circuit put it, "[r]estricting market entry . . . necessarily limits the available service because it

limits the number of [providers] from which a [customer] can seek service." *Medigen*, 985 F.2d at 167.

The evidence confirms it. Mississippi ranks "towards the bottom" nationally for home health agencies per capita, as its own designee conceded. ROA.2096. That ranking is not an outlier. CON states nationally have about half as many home health agencies per Medicare beneficiary, and less competitive home-health markets. ROA.1976. The same pattern appears across healthcare: CON states have fewer hospital beds, fewer hospitals with MRI machines, fewer medical imaging providers, and lower utilization of medical imaging. ROA.2020-21.

The deficiencies hit the most vulnerable populations hardest. The State has suggested that the CON Law encourages providers to locate in underserved rural areas. ROA.1455. The research shows the opposite. CON states have fewer rural hospitals, fewer rural surgery centers, and reduced access to rural hospice care. ROA.2018-19. There is no rational reason that prohibiting providers from entering profitable areas would encourage them to enter financially unattractive ones. As the First Circuit has held, a CON law "cannot reasonably be thought to advance" the purpose of increasing the number of pharmacies in underserved areas. *Walgreen*, 405 F.3d at 60. Indigent populations fare no better: the research shows that CON

laws do not increase charity care or lead to cross-subsidization of Medicaid patients. ROA.2019-20, 3045-46.

The decreased access to care caused by the CON Law is not hypothetical. In March 2020, during the early weeks of the COVID-19 pandemic, Mid-Delta Home Health, Inc., a CON-holding home health agency, requested an emergency waiver of the State's CON regulations to serve patients in Hinds and Pike Counties, counties outside the geographic territory authorized by its CON. ROA.3058. Mid-Delta explained that it had received "numerous calls from upset hospital discharge planners / caseworkers, physicians, and infusion companies" because the home health agencies licensed in those counties were declining to accept patients being discharged from hospitals. ROA.3058. Mid-Delta itself was "not licensed for Pike or Hinds counties due to the Mississippi CON laws." ROA.3058. A week later, Mid-Delta's counsel wrote MSDH again, expressing frustration that patients were suffering and stating: "We run our business from the heart and not from a profit and loss analysis." ROA.3060. The State Health Officer denied the waiver on the ground that allowing Mid-Delta to provide care in adjacent counties would not "prevent, hinder or delay action necessary to cope with the COVID-19 pandemic." ROA.3064. Neither the Department's witnesses nor its records could establish whether MSDH even investigated the report. ROA.3032; ROA.2095. The district

court itself observed that Mid-Delta's experience demonstrated "insufficient access" in "a time of crisis," a conclusion the court reached in its Moratorium analysis, but which applies with equal force to the CON Law's geographic restrictions: the direct cause of Mid-Delta's inability to provide care. ROA.3875.

Mid-Delta's experience tracks broader research on CON laws' performance during the pandemic. Dr. Stratmann's peer-reviewed work shows that CON laws resulted in lower hospital-bed capacity, which left hospitals more likely to operate at capacity and reject needy patients. ROA.2021-22. The connection to home health is direct: home-health services reduce hospitalizations and demand for hospital beds. ROA.2022. Other research has found that "states with high healthcare use due to COVID that reformed their CON laws during the pandemic had a reduction in mortality resulting from COVID-19, septicemia, diabetes, chronic lower respiratory disease, influenza or pneumonia, and Alzheimer's Disease, relative to non-reforming CON states." ROA.2022.

The CON Law restricts access by design and in practice. On the full record, the CON Law bears no rational relationship to increased access to care.

**E. The CON Law is not rationally related to improving quality.**

The record also refutes the State's quality rationale. CON laws are associated with worse patient outcomes, including deaths from heart failure, heart

attack, pneumonia, and complications of surgery, even controlling for the health of the patient population. ROA.2018. In states with the most CON regulation, patients are also less likely to rate hospitals highly. ROA.2018. The COVID-19 pandemic produced a natural experiment, and the result tracked. States with high healthcare use that reformed their CON laws during the pandemic saw a reduction in mortality from COVID-19 and a range of other conditions, relative to states that did not reform. ROA.2022. Put simply, in states where CON laws regulate provider entry, incumbents "tend to provide lower-quality services." ROA.2017-18.

The same pattern holds, and more sharply, in home health specifically. Three studies have examined whether CON regulation improves the quality of home-health services, and not one finds that it does. ROA.2030-33. The first, from 2014, found that "[r]emoving entry regulations for home health would have negligible system wide effects on health care costs and quality." ROA.2031. The second, also from 2014, found that CON laws are not associated with meaningfully improved quality, and that, in the most competitive markets, there is "a more rapid deterioration of quality when entry is restricted by CON." ROA.2030-31. The third, from 2018, found that CON laws are linked to more low-quality and fewer high-quality home health agencies. ROA.2033.

And, as with costs and access, the federal government agrees. In 2018, the Departments of Health and Human Services, Treasury, and Labor concluded that "available evidence suggests that CON laws have failed to produce cost savings, higher quality healthcare, or greater access to care, whether in underserved communities or in underserved areas." ROA.2015.

And in any event, Mississippi already ensures home-health quality through a separate licensure system designed for that purpose. The State admitted as much: the purpose of licensure is to assure providers meet standards that are an "indicator of adequate care." ROA.2721. As the Supreme Court has explained, the existence of other laws directly addressing a possible abuse "casts considerable doubt upon the proposition that" another more attenuated law "could rationally have been intended to prevent those very same abuses." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 536–37 (1973); *see also Lucid Grp. USA, Inc. v. Johnston*, No. 1:22-CV-1116-RP, 2023 WL 5688153, at *5 (W.D. Tex. June 21, 2023) (unpublished) ("the existence of other applicable consumer-protection and public safety laws can undermine the asserted relationship between these legislative goals and the law at issue.") (*citing St. Joseph Abbey*, 712 F.3d at 226).

Even so, the district court accepted the Defendants' speculation that the CON Law increases the quality of care because "a high patient volume offers

medical providers liquidity to invest in their facilities." ROA.3860. Yet the State's expert could not provide evidence that this actually happens. ROA.2921-22. According to a 2014 expert review, there is "no evidence of a volume-outcome relationship" in home health. ROA.2025; *see also* ROA.2921 (State's expert witness on any contrary literature: "I'm not familiar with it."). Instead of meaningfully evaluating this unambiguously one-sided evidence, the district court remarked only that it was "not convince[d]." ROA.3880. That was error.

Moreover, in invalidating the Moratorium, the district court itself acknowledged that quality has "a more subjective observation that lays solely within patients' preferences." ROA.3876. A law that "restricts patients' ability to choose a home health provider" is itself a loss of quality on that dimension. ROA.3876. And "because competition is so drastically restricted, there is little incentive for [incumbent] agencies to ensure that patients' needs are met." ROA.3877. But the district court did not extend that analysis to the CON Law, where it applies with equal force. The Defendants' theory turns on this same dynamic, but cuts the wrong way. They want to block patients from choosing the startups they would prefer over incumbents, on the theory that limiting patient choice will lead to higher quality. But what the Defendants call a threat is simply patients choosing new options that better serve them. That is itself an

improvement in quality. A law cannot be rational on the theory that quality is improved by blocking patients from getting the care they prefer.

The record shows that CONs do not improve quality. The home-health-specific record shows that CONs do not improve quality. The federal government has concluded that CONs do not improve quality. Even the district court, in its Moratorium analysis, recognized that restricting patient choice diminishes quality. Yet, without evaluating any of this, the court accepted the Defendants' speculation that the CON Law could improve care by blocking patients from choosing the agencies they would prefer. That was error.

## III. The Constitution protects a fundamental right to earn a living.

Plaintiff also argued below that the CON Law and Moratorium burden a fundamental right to earn a living and are subject to heightened scrutiny. ROA.3705-09. The district court applied rational-basis review. ROA.3852.

The Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Org.*, clarified the framework for determining when a right is fundamental: it must be "deeply rooted in this Nation's history" and "essential to our Nation's 'scheme of ordered liberty.'" 597 U.S. 215, 231, 237 (2022) (quotations omitted). The right to earn a living fits squarely within that framework. The right to enter a "known established trade" was "among the most cherished principles in English law,"

dating back as far as the 14th century. Timothy Sandefur, *The Right to Earn a Living*, 6 Chap. L. Rev. 207, 209–17 (2003). It was recognized over a century before the Founding, developed by English common-law courts, and carried forward by the Framers. *Golden Glow Tanning Salon, Inc. v. City of Columbus*, 52 F.4th 974, 982–83 (5th Cir. 2022) (Ho, J., concurring). Representative John Bingham, a principal drafter of the Fourteenth Amendment, described "our own American constitutional liberty" as "the liberty . . . to work an honest calling and contribute by your toil in some sort to the support of yourself, to the support of your fellowmen, and to be secure in the enjoyment of the fruits of your toil." *Id.* at 983 (Ho, J., concurring) (quotation omitted). The right to earn a living thus has "deep roots in our Nation's history and tradition." *Id.* at 981 (Ho, J., concurring).

The right is also essential to ordered liberty. The Supreme Court has long recognized that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich*, 239 U.S. 33, 41 (1915). The right has even been called "the most precious liberty that man possesses." *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 472 (1954) (Douglas, J., dissenting). And it remains "one of the most fundamental [] privileges" protected by the Fourteenth Amendment. *Sup. Ct. of N.H. v. Piper*, 470

U.S. 274, 280 n.9 (1985). The right is "essential to ensuring the ability of the average American citizen to exercise most of their other rights." *Golden Glow*, 52 F.4th at 984 (Ho, J., concurring).

CON laws are precisely the kind of restriction the right to earn a living emerged to prevent. They differ from licensing requirements, which may set "appropriate" and "attainable" qualifications without violating the right to pursue a lawful vocation. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). CON laws, by contrast, condition entry not on the applicant's fitness but on whether regulators believe existing providers are already meeting demand. As a result, they confer the right to work on "a privileged class" and "shut the door" to everyone else. *Smith v. Texas*, 233 U.S. 630, 638 (1914). These concerns are centuries old. The right to earn a living grew out of "the struggles between the Crown and the courts over the problem of monopoly." *Golden Glow*, 52 F.4th at 981 (Ho, J., concurring) (quotations omitted). And the right was central to the framers of the Fourteenth Amendment, who drafted it in part to combat the Black Codes that southern states enacted to deny freed black Americans the right to enter lawful occupations. Mississippi's version, for example, "barr[ed] them from following certain occupations." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) (Thomas, J., concurring) (quotation omitted). The

Fourteenth Amendment has continued to protect the right to earn a living even after the Supreme Court's decision in the *Slaughter-House Cases* narrowed the Privileges or Immunities Clause. 83 U.S. (16 Wall.) 36 (1872); *see, e.g.*, *Dent*, 129 U.S. at 122. Moreover, the Supreme Court applied that protection in *New State Ice Co. v. Liebmann*, to strike down an early form of CON law for ice manufacturers. 285 U.S. 262, 278 (1932). And that decision came *after* the Supreme Court adopted "the presumption of constitutionality" for economic legislation. *O'Gorman & Young, Inc. v. Hartford Fire Ins. Co.*, 282 U.S. 251, 257 (1931). Mississippi's CON Law is similar to all these prior abuses, placing Plaintiff's claims at the historical core of the right to earn a living.

Plaintiff acknowledges that this Court's panel decision in *Golden Glow* forecloses the application of heightened scrutiny to laws burdening the right to earn a living. 52 F.4th at 979. But history and tradition show that this right is deeply rooted, essential to our Nation's scheme, and emerged to prevent precisely the sort of exclusive grants that CON laws represent. Plaintiff therefore raises this argument to preserve it for *en banc* appeal, or for a petition for a writ of certiorari.

## IV. The district court erred in denying Plaintiff's attorney fees.

The Civil Rights Attorney's Fees Award Act of 1976 provides that "the court, in its discretion, may allow the prevailing party" in a § 1983 action "a

reasonable attorney's fee as part of the costs[.]" 42 U.S.C. § 1988. "Section 1988 creates a presumption that attorney's fees will be granted to a prevailing civil rights plaintiff in all but special circumstances." *Doe v. Silsbee Indep. Sch. Dist.*, 440 F. App'x 421, 424–25 (5th Cir. 2011) (citation omitted). "To qualify as a prevailing party, the plaintiff must (1) obtain actual relief, such as an enforceable judgment or a consent decree; (2) that materially alters the legal relationship between the parties; and (3) modifies the defendant's behavior in a way that directly benefits the plaintiff at the time of the judgment or settlement." *Walker v. City of Mesquite*, 313 F.3d 246, 249 (5th Cir. 2002) (*citing Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)).

Below, the district court granted Plaintiff's motion for summary judgment in part and declared the Moratorium "unconstitutional under the Due Process Clause of the Fourteenth Amendment." ROA.3882. Thus, Plaintiff "obtain[ed] actual relief[,]" that "materially alter[ed] the legal relationship between the parties" and "modifie[d] the defendant's behavior in a way that directly benefits the plaintiff[.]" *Walker*, 313 F.3d at 249. Having met all three prongs of the Fifth Circuit's test, Plaintiff is a prevailing party. The district court nonetheless denied Plaintiff's request, ROA.48, with a single sentence of reasoning: "Because each Motion for Summary Judgment is granted in part and denied in part, no attorneys' fees, costs, or expenses shall be awarded to any party." ROA.3882. That was error.

As a threshold matter, no legal authority supports the district court's framework. Instead, the correct standard is "[i]f the plaintiff has succeeded on '*any* significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit,' the plaintiff has crossed the threshold to a fee award of some kind." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791–92 (1989) (quotation omitted) (emphasis supplied). Consequently, "the degree of the plaintiff's overall success goes to the reasonableness of the award . . . not to the availability of a fee award *vel non*." *Id.* at 793.

Moreover, the district court's decision lacked any factual basis. Defendant-Appellees here never sought a fee award to begin with. Nor could they. "[A]n award of attorney's fees to a prevailing defendant under § 1988 is 'presumptively unavailable,' and is proper only upon a finding that the plaintiff's suit is 'frivolous, unreasonable, or groundless[.]'" *Doe*, 440 F. App'x at 425 (quotation omitted). No such finding has been made or could have been made in this matter.

The fee analysis here is simple: Plaintiff claimed that the Moratorium violated his rights under the Fourteenth Amendment. The district court agreed. Plaintiff has prevailed. This Court should reverse the district court's denial of attorney's fees, costs, and expenses, and remand for a determination of the appropriate award.

## CONCLUSION

A rational relationship must be based on specific facts, not simply assumed. The rational-basis standard establishes a presumption that facts exist to support a challenged law, but that presumption is rebuttable by evidence. The district court recognized this when it evaluated the record to invalidate the Moratorium.

Plaintiff-Appellant has developed a record showing that none of the CON Law's stated rationales survive scrutiny: CON theory makes no sense for home health; the law does not advance public health and safety; it does not contain costs; it does not increase access; and it does not improve quality. The district court did not consistently engage that record, and deemed unrefuted evidence "immaterial." Under consistent application, the CON Law cannot survive rational-basis review.

This Court should reverse the relevant parts of the judgment, grant summary judgment to Appellant, and remand for determination of attorney's fees.

Respectfully submitted,

*/s/ Aaron R. Rice*
Aaron R. Rice
MS Bar No. 103892
AMERICAN DREAM LEGAL
1888 Main Street, Suite C, 164
Madison, Mississippi 39110
Telephone: (601) 879-5595
aaron.rice@americandreamlegal.org

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Aaron R. Rice*
AARON R. RICE

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1, this document contains 8,255 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity.

*/s/ Aaron R. Rice*
AARON R. RICE

# ADDENDUM

## 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 1.1

Rule 1.1. General Statement of Public Policy.

Section 41-7-171 et seq., Mississippi Code of 1972 Annotated, as amended, established the Mississippi Department of Health (Department) as the sole and official agency of the State of Mississippi to administer and supervise all state health planning and development responsibilities of the State of Mississippi.

The intention of health planning and health regulatory activities is to prevent unnecessary duplication of health resources; provide cost containment, improve the health of Mississippi residents; and increase the accessibility, acceptability, continuity and quality of health services. The regulatory mechanism to achieve these results is the Certificate of Need (CON).

A CON must be obtained from the Department before undertaking any of the activities described in Section 41-7-191 (1) without obtaining a Certificate of Need (CON) from the Department. No final arrangement or commitment for financing such activity may be made by any person unless a CON for such arrangement or commitment has been issued by the Department. The Department will only issue a CON for new institutional health services and other proposals which are determined to be needed pursuant to statutory requirements. Only those proposals granted a CON may be developed or offered within the State of Mississippi.

Only the Department, acting in response to an application for a certificate of need, or in response to a decision of a court of competent jurisdiction, may cause a CON to be issued, denied, or withdrawn or may determine that CON review is not required. In carrying out these responsibilities, the Department shall make decisions to issue or withdraw a CON by conducting the review of each application in accordance with the adopted procedures, standards, and criteria.

No CON shall be issued unless the action proposed in the application for such Certificate has been reviewed for consistency with the specifications and criteria established by the Department and substantially complies with the projection of need as reported in the State Health Plan which is in effect at the time the application is received by the Department.

The Department will disapprove a CON application if the applicant fails to provide or confirm that the applicant shall provide a reasonable amount of indigent care or has admission policies which deny access to care by indigent patients.

The Department will disapprove a CON application if approval of the request would have significant adverse effect on the ability of an existing facility or service to provide Medicaid/indigent care.

The State Health Officer shall determine whether the amount of indigent care provided or to be offered is "reasonable." The Department has determined that a reasonable amount of indigent care is an amount which is comparable to the amount of such care offered by other providers of the requested service within the same, or proximate, geographic area.

The Department shall adopt and revise as necessary criteria and review procedures for CON applications. Before review of new institutional health services or other proposals requiring a CON, the Department shall disseminate to all health care facilities and health maintenance organizations within the State and shall publish in The Clarion-Ledger (Jackson, Mississippi) and other newspapers deemed appropriate a description of the scope of coverage of the State Department of Health's Certificate of Need Program. Whenever the scope of such coverage is revised, the State Department of Health shall disseminate and publish a revised description in like manner.

Certificates of Need shall be issued by the State Health Officer based upon those criteria and standards established and lawfully adopted. Appropriate mechanisms for providing affected persons an opportunity for a formal hearing on matters to be considered by the State

Department of Health have been developed. No CON shall be granted or denied until affected parties have been accorded such right to a formal hearing.

A CON is not transferable from one person or entity to another except with the approval of the Department. A CON shall be valid for a designated period of not more than one year from the effective date. The Department may extend the CON for a period not to exceed six months in those cases where the applicant shows to the satisfaction of the State Department of Health that a good faith effort has been made toward completion of the project.

All approved projects will be monitored by Department staff to assure compliance with stated policies, standards (including Life Safety, Construction, and Licensure), and approved costs.

Recipients of Certificates of Need are required to make written progress reports of their projects at least every six months and at completion.

NOTE: If any section, chapter, articles, paragraph, sentence, clause, phrase, rule or regulation, or any other part or portion of this State Certificate of Need Review Manual is declared by proper authority to be invalid or of no effect, the remainder hereof shall be in no manner affected thereby but shall remain in full force and effect.

Whenever or wherever the occasion may arise to present conflict between this State Certificate of Need Review Manual and legislative statutes, the legislative statutes shall prevail.